**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ | ) |
| | ) |
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| NICHOLAS KOUDANIS, NICHOLAS | )    Criminal Action |
| MARKOS, ELENI KOUDANIS, and | )    No. 15-10387-PBS |
| STEVEN KOUDANIS, | ) |
| | ) |
|                   Defendants. | ) |
| _____ | ) |

**MEMORANDUM AND ORDER**

September 15, 2016

Saris, C.J.

**INTRODUCTION**

Defendants, owners and operators of Nick's Famous Roast
Beef in Beverly, Massachusetts, have been indicted in an alleged
tax evasion scheme. The scheme purportedly involved the
defendants underreporting cash income generated at the
restaurant during the 2008-2013 tax years and subsequently
fabricating cash receipts during an IRS audit. Defendants
Nicholas Koudanis, Eleni Koudanis, and Steven Koudanis have
moved for a Franks hearing and to suppress evidence gathered by
the government during the December 11, 2014 searches of the
restaurant and the Koudanis residence. The defendants argue that
the affidavit submitted in support of the search warrant

1

application contained material misstatements and omitted material information that the affiant either knew about or could have learned if he had performed a further investigation. Because the defendants have not made a substantial showing (1) that the affiant acted intentionally or recklessly with regard to the alleged misstatements or omissions and (2) that probable cause would be lacking had these misstatements been excluded or the omissions included, the defendants' motion for a <u>Franks</u> hearing and to suppress (Docket No. 65) is **DENIED**.

## FACTUAL BACKGROUND

Nick's Famous Roast Beef (Nick's), located in Beverly, Massachusetts, opened in 1975 and specializes in roast beef sandwiches and fried foods. Nicholas Koudanis (Koudanis) and Nicholas Markos (Markos) each own one-half of the restaurant and are responsible for the restaurant's daily operations. Eleni Koudanis, Nicholas Koudanis's wife, manages the business's books. Steven Koudanis, son of Nicholas and Eleni Koudanis, works in the restaurant.

On December 9, 2014, Magistrate Judge Page Kelley issued warrants to search the restaurant and the home of Nicholas and Eleni Koudanis. The warrant applications relied on an affidavit prepared by IRS Special Agent William Noonan. Agent Noonan presented the following facts in his affidavit to the magistrate judge.

Based on Noonan's investigation, Nick's received gross cash income far in excess of what it reported to the IRS. Noonan stated that the defendants sought to conceal these tax underpayments in two ways. First, Nick's is a cash business. It only accepts cash and it has an ATM for customers to use. It also pays for many of its roast beef shipments in cash. This allows Nick's to declare that its expenses are less than they actually are. By declaring less in the way of expenses, Nick's can more easily justify its underreporting in the way of income. Second, and relatedly, the defendants use a second cash register to fabricate cash receipts. The fake receipts, showing less income than was received, were then used to prepare Nick's tax filings.

Noonan estimated that Nick's gross receipts were approximately $2 million more per year than it reported on its tax returns. Noonan learned that this additional income was used by Koudanis and his sons to purchase real estate, nearly $800,000 of which was paid for in cash, far in excess of what they reported as income on their tax returns.

In reaching these conclusions, Agent Noonan relied primarily on two confidential informants (CIs), with corroboration from other witnesses, documents, and photographs. Each CI independently contacted the IRS Whistleblower Office

about the alleged tax fraud. CI 1 submitted his tip in April
2010. CI 2 submitted her tip in September 2012.

I.   **Confidential Informant 1**

Noonan described CI 1 as experienced in the restaurant and
restaurant supply business. In 1969, CI 1 began working for a
sandwich shop chain. He worked at the company's main office,
where franchisees purchased their food supplies. In 1978, after
nine years in this position, CI 1 purchased the food supply arm
of the business. For nearly twenty years -- from 1978 to 1996 --
CI 1 owned and operated this food supply business. During this
period, he grew the business from $2 million in annual sales to
$14 million in sales by adding numerous pizza and roast beef
shops as clients. In 1996, CI 1 closed the business because of
increased debt and other problems.

Soon after, Agar Supply Company hired CI 1. When CI 1
joined Agar, he brought with him many of his former clients.
Many of those clients requested that they be permitted to
continue paying part of their orders in cash. Prior to the time
CI 1 joined Agar, nearly all of CI 1's clients used two separate
accounts for food supply purchases: a cash account and a check
account. The clients would report only purchases made by check
on their tax returns. Purchases made in cash went unreported to
the IRS. When CI 1 joined Agar, many of the clients he retained
sought this same treatment from Agar. Ultimately, in 2002, Agar

4

gave CI 1 its blessing to use cash accounts in hopes that it would drive up sales. CI 1 provided Noonan with copies of Agar records confirming the cash account practice. CI 1 stated that Agar employed the two-account system from at least 2002 to 2006.

After implementing the two-account system, Agar hired additional salespersons to oversee the increased demand. In 2004, Agar hired Flora Papadopolous, who had previously worked in a roast beef restaurant for many years. In 2005, Agar hired another employee, Paula Hios. Hios also had experience in the roast beef business. Based on conversations with Papadopolous and Hios, CI 1 told Noonan that the two-account system continued after he was fired in 2006. He estimated that nearly 70% of Agar's clients paid some portion of their bills in cash.

Nick's was one of Agar's clients participating in the two-account system. Nick's has been an Agar client since 2003. CI 1 told Noonan that, as of 2006, Nick's was purchasing between 50 and 60 boxes of roast beef per week from Agar. Agar delivered four shipments per week to Nick's; three of the four were paid for in cash. Based on CI 1's experience, he believed that Nick's generated $1,000 in gross cash sales per box per week for a total of $50,000 to $60,000 each week in 2006.

CI 1 no longer works at Agar; he was fired from his position in 2006. CI 1 explained to Noonan why he had been terminated. CI 1 said that Agar told CI 1 that he had not

followed the company's policy requiring salespeople to deposit all cash received from customers within twenty-four hours. Agent Noonan explained in his affidavit that CI 1 was angry at Agar after it fired him. CI 1 stated that he went to work for Agar's competitors, but that his former clients declined to change suppliers. Noonan also noted that CI 1 stated that, in addition to any financial reward he might earn from his whistleblower tip, he hoped that the investigation would negatively affect Agar. Noonan ran a criminal background check on CI 1 and found only an OUI from 2012.

On April 6, 2014, CI 1 called Hios, a former colleague of CI 1's at Agar. The call was recorded. In September 2012, after CI 1 was fired, Reinhart Foodservice, LLC, acquired Agar. Reinhart is one of the largest food distributors in the country. At the time of the 2014 phone call with CI 1, Hios worked for Reinhart. CI 1 asked Hios if Reinhart had maintained Agar's two-account system after the acquisition. Hios replied that some clients continued to use cash accounts, but no new clients were afforded the option. Hios stated that she believed the two-account system posed a significant audit risk for Reinhart's customers, particularly because Reinhart tracked total purchases, including payments made in both cash and check.

On June 17, 2014, CI 1 met with Hios and her cousin, Peter Belesis. The meeting was recorded. Belesis also worked for

Reinhart. Belesis traveled to Reinhart's client roast beef shops and advised them on how they can improve their operations. Prior to joining Reinhart, Belesis himself owned two roast beef shops. Based on these experiences, Belesis estimated that the food cost at a roast beef restaurant constitutes approximately 45% of the shop's total expenses. Belesis stated that roast beef cost about $2.50 per pound. Hios told CI 1 that, as of 2014, only a few restaurants still used a cash account at Reinhart. Nick's was one of the remaining few. Based on the recorded conversation with Hios and Belesis, Agent Noonan concluded that Nick's was doing $60,000 to $70,000 in business per week[1] and, because the company made $1,000 in sales per box, Nick's was purchasing 60 to 70 boxes a week in 2014 (as opposed to between 50 and 60 in 2006 when CI 1 was still at Agar).

## II.  Confidential Informant 2

Agent Noonan's second principal source was CI 2. Noonan stated in his affidavit that CI 2 is a relative of the Koudanis family. CI 2 had visited the Koudanis residence in Topsfield, Massachusetts, on multiple occasions.

During the summer of 2012, CI 2 personally overheard two of Koudanis's adult sons, Steven and Costas Koudanis, discussing how to use a second cash register to generate false cash

---

[1] Defendants challenge this interpretation of the recorded conversation. I agree the conversation is unclear.

receipts. The fake receipts were to be used in case of an audit. CI 2 also heard one son state that the fabricated receipts had previously proven useful during a Massachusetts Department of Revenue audit. One son explained that the Koudanis's former accountant had formulated the idea to produce a false set of cash receipts many years ago. The son said that Nick's had been doing so ever since.

CI 2 saw the second cash register for the first time sometime before the summer of 2012. The register was located in the empty storefront adjacent to Nick's. While at Nick's, CI 2 witnessed employees traveling back and forth between the two storefronts. After watching this, CI 2 went in the neighboring space and saw the second register.

CI 2 also saw the second cash register at the Koudanis residence multiple times in 2012. Typically, the cash register was in the basement on a small table next to a trash bag full of receipts. Noonan attached to his affidavit copies of photographs taken by CI 2 that showed the register and the trash bag of receipts. CI 2 took the photographs in July 2012. When CI 2 last visited the Koudanis residence, in May 2013, the register was there.

During one visit to the Koudanis home, CI 2 saw the register on Steven Koudanis's desk in the Koudanis's basement. Steven was sitting at the desk keying in information. According

to CI 2, Steven spent much of the day entering numbers into the register.

CI 2 also learned -- from one of Koudanis's sons and from her own observations -- that Eleni Koudanis maintained Nick's financial records. Eleni kept all records on paper. Eleni had previously worked at a credit union and was experienced in bookkeeping. Eleni worked out of an office in the back of Nick's.

One of Koudanis's sons told CI 2 that Koudanis and Eleni Koudanis had used their unreported cash income to make a number of large purchases. Koudanis bought real estate, including a home for his son, Costas, in Middleton. Eleni had purchased a significant amount of jewelry and collectibles. Eleni told CI 2 that the diamond ring she wears cost $30,000. CI 2 learned from one of the Koudanis's sons that there was a large safe in the Koudanis's house where Koudanis and Eleni keep jewelry and large sums of cash. Koudanis additionally sent large amounts to individuals in Greece.

CI 2 informed Noonan that she was motivated to report potential tax violations by Nick's because her spouse had been treated poorly by Koudanis. She also worried that her spouse's association with Koudanis would implicate her spouse. Noonan performed a criminal background check of CI 2; it returned no criminal record.

### III. <u>IRS Audit</u>

After CI 2 filed her whistleblower tip, the IRS audited Nick's. Revenue Agent Matthew Holden performed the audit. Holden met with Nick's accountant and return preparer, Zoe Kourbanides, in August 1, 2013. Kourbanides prepares taxes for many roast beef shops and she is familiar with the industry. Kourbanides told Holden that Koudanis, Markos, and Eleni Koudanis all have access to Nick's business bank account; all three individuals make deposits and write checks from the account.

Each month, Kourbanides receives a copy of the business's bank statements. She relies on the bank statements to record income and expenses. She also prepares a monthly sales tax return. Kourbanides uses the daily Z-tapes -- tapes printed from the cash register that summarizes the day's sales -- to produce the sales tax return. Kourbanides totals each month's gross receipts to calculate the annual receipts for Nick's tax return.

On August 8, 2013, Holden met with Kourbanides, Koudanis, Eleni Koudanis, Markos, and Markos's wife, Georgia. These individuals gave Holden a tour of Nick's. During the visit, Holden inquired about the cash register and how many registers were used at the shop. Holden was told that three years ago Nick's purchased a new register, which was the only one used in the store. No one mentioned a second register.

10

Holden asked about Nick's closing procedures each night. He was told that, each night, all of the cash is put in a safe under the register. The next morning, one of the owners counts the cash and prints out the Z-tape from the register. Cash is deposited every other day to minimize bank fees.

Holden asked Eleni about any cash expenses paid by Nick's. Eleni provided a handwritten spreadsheet purporting to document all cash purchases made in 2011, the year at issue in the audit. The spreadsheet noted expenses for paper supplies, vegetables, and dairy products. Notably, Eleni made no mention of cash purchases of roast beef from Agar. When pressed as to whether there were any additional cash purchases made, Eleni answered that there were not.

## IV.   Tax Returns

Agent Noonan included in his affidavit Nick's tax return data for 2008 through 2012, including the shop's gross receipts, total expenses, and net income. Noonan then used information provided by CI 1, as well as by Hios and Belesis, to assess the accuracy of the data that Nick's provided to the IRS.

According to CI 1, roast beef is sold in 70-pound boxes. Each box generates approximately $1,000 in gross sales. After speaking with Belesis and Hios -- employees at Reinhart, Nick's roast beef supplier -- CI 1 estimated that Nick's gross sales figures were around $60,000 to $70,000 weekly. Noonan stated

11

that Nick's was likely purchasing between 60 and 70 boxes of roast beef per week.

CI 1 asserted that 10% of the roast beef sold by a supplier is fat and is trimmed off before it is served. Noonan stated that the usable amount in a 70-pound box is therefore only 63 pounds. Based on the usable ounces per box, the number of ounces in a given sandwich size at Nick's, and the percentage of total sales at Nick's for each sandwich size, Noonan performed calculations to ascertain how many sandwiches of each size could be made from a single box. Multiplying the number of sandwiches by their respective prices, Noonan estimated that Nick's sold $3,048,240 per year from 2008 to 2013. Given the gross receipts reported by Nick's -- ranging from about $876,000 in 2008 to $1,197,000 in 2013 -- Noonan concluded that the reported amounts were far lower than the actual gross receipts.

Noonan also reviewed the individual income tax returns filed by Koudanis and Markos. Koudanis reported an annual salary of $94,200 for himself and $26,000 for Eleni. Markos did not take an annual salary, but his wife Georgia received $94,200. Koudanis and Markos also received income distributions from Nick's. Koudanis's total taxable income ranged from around $85,000 in 2007 to a high of $130,000 in 2012. Markos's total taxable income ranged from around $73,000 in 2007 to a high of $108,000 in 2012. During this period, Koudanis and his sons paid

12

over $788,000 in down payments on seven separate properties. Noonan stated that the incomes of Steven and Costas Koudanis alone would not have been sufficient to cover the $110,000 and $300,000 down payments on the homes they purchased.

Agent Noonan asserted that Markos was a heavy gambler, frequenting Foxwoods Casisno as well as local private games. From 2008 to 2014, Markos "bought in" for more than $231,000 at Foxwoods. Noonan corroborated the real estate purchases and gambling accounts through an independent search of the registry of deeds and his own investigation.

**V.    Searches**

On December 11, 2014, law enforcement officers searched Nick's and the Koudanis residence. They seized, among other things, business records, computers, hard drives, sales receipts, and approximately $1.6 million in cash.

**DISCUSSION**

The defendants ask the Court to hold a Franks hearing and to ultimately suppress all evidence obtained as a result of the search warrants executed on their residence and business premises. The defendants contend that Agent Noonan (1) acted recklessly by relying on false information regarding the amount of roast beef sold at Nick's in formulating his opinion that Nick's underreported gross sales, (2) omitted material information about the CIs' biases against the defendants, and

(3) ignored red flags raised about the CIs' credibility and failed to make a reasonable inquiry into their reliability. The government responds that the agent reasonably relied on CI 1's statements regarding the amount of roast beef sold, that the agent properly disclosed the CIs' biases, and that the agent had no duty to conduct any further inquiry into the CIs' truthfulness.

To obtain a Franks hearing, the defendants must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and that the "allegedly false statement [was] necessary to the finding of probable cause." United States v. Castillo, 287 F.3d 21, 25 (1st Cir. 2002) (quoting Franks v. Delaware, 438 U.S. 154, 155-56 (1978)). "Suppression of the evidence seized is justified if, at such a hearing, the defendant proves intentional or reckless falsehood by preponderant evidence and the affidavit's creditworthy averments are insufficient to establish probable cause." United States v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015). "To prove reckless disregard for the truth, the defendant must prove that the affiant in fact entertained serious doubts as to the truth of the allegations." United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002) (citation omitted). "Recklessness may be inferred from circumstances evincing

14

obvious reasons to doubt the veracity of the allegations." Id.
(citation omitted).

"A material omission of information may also trigger a
Franks hearing." Castillo, 287 F.3d at 25. "The required showing
is two-fold: first, the omission must have been either
intentional or reckless; and second, the omitted information, if
incorporated into the affidavit, must be sufficient to vitiate
probable cause." Tanguay, 787 F.3d at 49. "Because there is no
requirement that every shred of known information be included in
a warrant affidavit, the omission of a particular detail,
without more, is not enough to satisfy the mens rea element of
the Franks test." Id. "Recklessness may be inferred directly
from the fact of omission only if 'the omitted information was
critical to the probable cause determination."' Id. (emphasis in
original) (quoting Burke v. Town of Walpole, 405 F.3d 66, 81
(1st Cir. 2005)). "Negligent omissions -- even negligent
omissions of highly probative information -- do not satisfy this
strict standard." Id.

In Tanguay, the First Circuit ruled that in limited
circumstances, a Franks violation also may "arise out of a
failure to include in a warrant affidavit facts not actually
known to the affiant." 787 F.3d at 53. An affiant's duty of
further inquiry is triggered when she has "knowledge of an
obvious and unexplored reason to doubt the truthfulness of the

allegations." Id. "When confronted with such a red flag, the officer should look into the matter even if she does not believe that what she will discover is likely to vitiate probable cause." Id. However, "when the affiant has no substantial reason to doubt the veracity or completeness of the information included in her affidavit, a failure either to verify the accuracy of that information or to go in search of contrary information is not reckless." Id. at 52. To establish a Franks violation in the context of this narrow duty of further inquiry, the affiant's doubts must be "of such a magnitude that her failure to conduct an additional inquiry evinced a reckless disregard for the truth as opposed to, say, mere negligence." Id. at 54. Even if the Court finds that the affiant was reckless in failing to inquire into the informant's truthfulness, the Court must ask if the affiant's foregone investigation "would have discovered new information that warranted inclusion in her affidavit" and "the affidavit, expanded to include that new information, would continue to support a finding of probable cause." Id. A Franks violation is established only if the Court finds that the newly discovered evidence would change the probable cause analysis. Id.

**I.   Material False Statements**

The defendants assert that Agent Noonan intentionally or recklessly included false statements in his affidavit and that

these statements were necessary to the probable cause determination. The defendants primarily take aim at two statements: that only 10% of every roast beef box is lost during the cooking and preparation process, and that Nick's purchased between 60 and 70 boxes of roast beef each week. Both figures were used by Noonan to determine the amount of the defendants' tax underpayment. The government responds that Noonan had reason to believe these estimates were accurate and that, even if he was reckless in relying on them and the affidavit is reformed to exclude them, the affidavit supplies enough other evidence of tax fraud to support probable cause.

As a preliminary matter, the government concedes that Nick's purchased fewer boxes per week than was listed in the affidavit. See Docket No. 78 at 24. While the recorded conversation is unclear on the amount of sales in 2014, CI 1 provided first-hand information about 50 to 60 boxes in 2006.

As to the unusable percentage of roast beef in every box, however, the parties disagree. Relying on a video made by the defendants, which was filmed after they were indicted, as well as an affidavit from James Garabedian, whose daughter is engaged to defendant Steven Koudanis, the defendants contend that nearly half of every box is lost.[2] See Docket No. 67 at 11.

---

[2] At the hearing and in its supplemental briefing, the government stated that it spoke with two former Nick's employees who

The Court need not resolve this factual dispute. Regardless of the actual percentage, the defendants have not made a substantial showing that Agent Noonan had "obvious reasons to doubt the veracity of [CI 1's] allegations." See Ranney, 298 F.3d at 78. CI 1 had been in the roast beef business for more than thirty years beginning in 1969. For the first nine years, he worked at the main office of a chain of sandwich shops. He then purchased the food supply end of that business in 1978, supplying food to forty-five sub shops. In 1996, Agar -- Nick's roast beef supplier -- hired CI 1. At Agar, CI 1 was personally involved in supplying roast beef to Nick's and other roast beef shops. See Docket No. 67, Ex. 12 at 6 (CI 1 "recalled that he typically sold 45 to 60 boxes of roast beef to Nick's"). Much of his information therefore stems from first-hand experience. See United States v. Gifford, 727 F.3d 92, 99 (1st Cir. 2013) (noting that one factor used by the First Circuit in examining a probable cause determination involving a confidential informant is "whether an informant's statements reflect first-hand knowledge"). Many of CI 1's statements were corroborated, including that Agar allowed customers such as Nick's to pay for a large part of their roast beef shipments in cash. See id. (stating that another factor in evaluating an informant's

---

asserted that the loss percentage is closer to 20%. See Docket No. 82 at 1.

credibility is "whether some or all of the informant's factual statements were corroborated"); Noonan Aff. ¶ 21, Docket No. 67, Ex. 19. And, "[u]nlike an anonymous tipster, the CI was known" to Noonan and other investigators and he "could be held responsible if his assertions proved inaccurate or false." See United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002).

So where's the defendants' beef? The defendants point to three reasons why, despite CI 1's experience in the business, Agent Noonan was reckless in relying on CI 1's estimates.

First, the defendants emphasize that CI 1 did not work in a kitchen, but was on the supply side of the business. But even though he did not personally cook roast beef, CI 1 interfaced with those who did for decades. Noonan was not reckless in relying on this accumulated experience in formulating his calculations.

Second, the defendants assert that CI 1 had a financial incentive to inflate the extent of the tax fraud in hopes of securing a larger whistleblower award. In support, the defendants note that a whistleblower is entitled to a greater share of the recovery when the fraud underpayment exceeds $2 million. The defendants ignore the fact that submissions to the IRS whistleblower program are made under penalty of perjury and that whistleblower awards are paid only if the IRS actually recovers unpaid taxes. CI 1 would only recover to the extent his

information was accurate and proved useful in the IRS's investigation. The existence of a potential financial incentive did not make Noonan's reliance on CI 1's information reckless.

Third, the defendants contend that Noonan could have verified that Nick's bought fewer boxes of roast beef than CI 1 claimed by reviewing Agar's records. The government explains, however, that Agar was unaware of the investigation into Nick's at the time that the searches took place. Because these records were not obtained until after the searches at issue, Noonan could not be deemed reckless for failing to review them.

The totality of the investigation corroborated the agent's lack of recklessness in relying on CI 1 and CI 2.[3] Nick's was a cash-only business, Agar's customers paid for some of their shipments in cash, Nick's was one of those customers, Nick's was one of a handful of shops to still use a cash account in 2014, Agar employees knew customers used these cash accounts to underreport their expenses and gross income, the defendants had a second cash register that it did not disclose to the IRS, one of the defendants was seen using the register at home to create new receipts, one of the defendants was heard talking about how the fabricated receipts would evade an audit, the defendants had

---

[3] The Court need not determine whether these facts are sufficient to establish probable cause even without Noonan's estimate of the magnitude of the evasion.

20

made down payments and other purchases far in excess of their
reported incomes, and the defendants did not disclose to the IRS
that it was paying for a portion of their roast beef shipments
in cash. As such, there was circumstantial evidence
corroborating the accuracy of the CIs' reports.

The crux of the defendants' argument is that the sales
estimates were false and that the true figures undermine a
finding of probable cause to find willful tax evasion. But even
the defendants' alternative figures -- that Nick's averaged 41
boxes per week and that nearly half of each box was lost during
the cooking and preparation process -- are indicative of a tax
fraud scheme. Citing those two data points, the defendants state
that Nick's annual sales were approximately $1,229,000 for 2013
and 2014 (the defendants make no representation as to their
gross receipts from prior years). See Docket No. 67 at 10-11. To
the extent the sales data was consistent with sales from the
preceding years, the government argues the tax underpayment
would have been substantial (totaling nearly $1.5 million and
ranging from more than $350,000 in 2008 to over $31,000 in
2013). See Noonan Aff. ¶ 57, Docket No. 67, Ex. 19; Docket No.
78 at 25. Defendants argue that these relatively low
underpayments undermine a finding of willfulness.

Even if the defendants' argument were right, the defendants
have not made a substantial showing that Agent Noonan recklessly

relied on CI 1's information regarding the number of roast beef boxes purchased and the usable percentage of each box.

## II.  **Material Omissions**

The defendants also argue that Agent Noonan knowingly omitted material information which, had it been included, would have negated probable cause. The defendants assert that these omissions pertain to biases that each CI harbored against the defendants and that would have made the CIs' statements less credible.

As to CI 1, the defendants note that Agent Noonan did not specifically state that CI 1 had any particular antagonism towards Nick's. See Docket No. 67 at 21. In explaining CI 1's motivations, Noonan wrote that CI 1 was "fired by Agar in 2006, and he was unable to regain any of his former customers when he went to work for Agar's competitors." Noonan Aff. ¶ 15 n.1, Docket No. 67, Ex. 19. Noonan further explained that CI "expressed anger with Agar and indicated that, in addition to getting some financial benefit from reporting these potential tax violations to the IRS, he would like to see it impact negatively on Agar." Id. What Noonan omitted was that, when asked in an interview with investigators about his reasons for coming forward, CI 1 specifically mentioned Nick's as one of the businesses he had contacted, noting that he had presented Nick's "with the opportunity to save approximately $100,000 over a

year's time." Docket No. 67, Ex. 12, ¶ 33. CI 1 stated that
Nick's rebuffed CI 1's offer and instead parlayed it into lower
pricing from Agar. Id.

Had these two lines been included, elaborating on the
motivations that Agent Noonan did disclose, the defendants
suggest that the probable cause assessment would have come out
the other way. The Court disagrees. In deciding the materiality
of an omission, "we assess 'whether, even had the omitted
statements been included in the affidavit, there was still
probable cause to issue the warrant.'" Castillo, 287 F.3d at 26
(quoting United States v. Rumney, 867 F.2d 714, 720 (1st Cir.
1989)). Had the affidavit been reformed to include mention of
CI 1 pitching a supply contract to Nick's and being turned away,
the affidavit would have still supplied probable cause. This
omission was not "critical to the probable cause determination."
See Tanguay, 787 F.3d at 49 (emphasis in original) (citation
omitted).

The defendants also argue that Noonan knowingly omitted
important information pertaining to CI 2's bias and credibility.
Noonan described CI 2 as a "relative of Koudanis." Noonan Aff.
¶ 33, Docket No. 67, Ex. 19. Noonan explained that CI 2 was
motivated to report potential tax violations to the IRS because
CI 2's "spouse has been treated poorly by Koudanis" and she was
also concerned about her spouse "potentially getting into

23

trouble for this conduct because of the spouse's association with Koudanis." Id. ¶ 33 n.4.

Noonan did not specifically mention that CI 2 was married to one of the Koudanis sons or that her and her husband's relationship with the Koudanis family had deteriorated. If this information had been included, it is unclear how -- if at all -- it would have changed the probable cause analysis. In one sense, it adds to the disclosures Noonan made, explaining further CI 2's motivation in submitting a whistleblower tip and creating the possibility of additional bias. On the other hand, knowing that CI 2 had been intimately familiar with the Koudanis family and a true insider would have likely bolstered the probable cause calculus.

Second, the defendants assert that Noonan failed to identify CI 2's husband as a drug addict. See Docket No. 67 at 22. Even if Noonan had been aware of this fact, it does not alter the probable cause analysis. CI 2's testimony is not based solely on observations by her husband. Rather, CI 2 was a percipient witness at various stages. See Noonan Aff. ¶¶ 33-35, 37, 40, Docket No. 67, Ex. 19.

None of the allegedly omitted information, if incorporated into the affidavit, would have been "sufficient to vitiate probable cause." See Tanguay, 787 F.3d at 49.

### III. **Failure to Investigate**

Finally, citing Tanguay, the defendants assert that Agent Noonan recklessly failed to investigate the basis of CI 1's termination from Agar and the percentage of a roast beef box lost in the preparation and cooking processes.

As to CI 1's termination, the defendants contend that CI 1 was fired for embezzling money, a fact they say Agent Noonan could have easily learned. As support, the defendants note that their investigations have discovered that the owner of Mike's Famous Roast Beef stated he was contacted by Agar for nonpayment after remitting $40,000 to CI 1 and "later heard CI 1 had been fired from Agar." Docket No. 67 at 19. The former CEO of Agar also told a defense investigator that he had "personally terminated CI 1 for embezzlement of approximately $30,000," and that CI 1 had a drug addiction problem. Id. at 20. Moreover, defendants point to civil litigation which stated that Agar fired CI 1 for failing to follow its collection policy and that CI 1 suffered from a drug addiction.

As to the roast beef preparation process, the defendants argue that "if Agent Noonan interviewed anyone with actual experience in the kitchen of a roast beef restaurant (unlike CI 1, who never worked in the kitchen of a roast beef shop), the 10% waste figure would have been rejected out of hand." Id. at

11.[4] To support this claim, the defendants reference the affidavit of James Garabedian, the soon-to-be father-in-law of defendant Steven Koudanis, which states that a restaurant loses up to 40% in trimming fat and another 10-15% in shrinkage from cooking.

In Tanguay, the First Circuit found that in limited circumstances, an affiant may have a duty to investigate an informant's assertions where there are "obvious reasons to doubt the veracity of the allegations." 787 F.3d at 52 (citation omitted). No obvious reasons existed here.

This case is readily distinguishable from Tanguay. In Tanguay, the affidavit in support of probable cause was based solely on a single informant's account. Id. at 46-48. In that case, the affiant received an email claiming that an individual whom the informant knew possessed child pornography. The affiant met with the informant once and recorded his account of the events. One week after the interview, and with no corroborating evidence, the affiant obtained a search warrant. At the time she submitted the warrant application, the affiant -- a New Hampshire state trooper -- asked a local police officer if he knew anything about the informant. The officer responded that

---

[4] As discussed supra, the government did ask two people who had actual experience working in the kitchen of a roast beef shop, specifically the kitchen at Nick's. They asserted that the loss percentage is approximately 20%. See Docket No. 82 at 1.

the informant was "quirky", "troubled," and "possibly afflicted by some degree of mental instability." Id. at 53. The officer also said that the informant had a history of suicidal ideation and had "experienced 'a few scrapes' with the law, specifically mentioning that [the informant] had been convicted of uttering a false prescription." Id. at 47. Despite this background, the affiant did not ask the officer "for more details nor did she make any effort to find out what other 'scrapes' [the informant] may have had." Id.

The First Circuit reversed the district court's holding that a Franks violation could never "arise out of a failure to include in a warrant affidavit facts not actually known to the affiant." Id. at 52-53. Because the affiant "had some reason to doubt the veracity of her informant" and because the affiant's "case for probable cause depended entirely" on a single informant's account, the court held that "this web of circumstantial evidence sent up a red flag -- and that red flag may have been sufficient to create a duty of further inquiry." Id. at 53.

Here, the case for probable cause is based on more than a lone informant's say-so over the course of a single interview. Probable cause was based on a multi-year investigation in which the two principal informants provided extensive, consistent details about the nature of the defendants' business and

27

descriptions of the two physical locations to be searched. Agent Noonan also corroborated the two CIs' accounts with statements from others (like the recorded conversation), documents, and photographs.

Here, Agent Noonan did not disregard a known reason to doubt the truthfulness of CI 1. The defendants contend that, had Noonan investigated further, he would have learned of reasons to doubt the accuracy of the informant's assertions, such as the actual percentage of roast beef lost during preparation and the number of boxes purchased. A further inquiry was not required merely because additional investigation possibly could have unearthed additional material details of the CI's soured relationship with Agar. See United States v. Sliwa, 109 F. Supp. 3d 360, 364 (D. Mass. 2015) (stating that the defendant "points to no comparable reason why [the affiant] should have had reason to doubt his informant—[the defendant] merely suggests that further inquiry may have called into question some of [the informant's] assertions"). Indeed, the civil litigation alleged details consistent with CI 1's explanation as to why he had been fired. See Docket No. 67 at 20 (noting that the Vice President of Human Resources at Agar averred that, as CI 1 disclosed to Agent Noonan, CI 1 had been fired for violating the company's collections policy after he failed to timely deposit client funds in Agar's accounts). The duty of further inquiry is not

prompted by the mere possibility of discovering damning information, but is only triggered when the agent has actual "knowledge of an obvious and unexplored reason to doubt the truthfulness of the allegations." <u>Tanguay</u>, 787 F.3d at 53. The defendants have not made a substantial showing that Agent Noonan had such knowledge.

<strong><u>ORDER</u></strong>

The defendants' motion for a <u>Franks</u> hearing and to suppress (Docket No. 65) is **<u>DENIED</u>**.

/s/ PATTI B. SARIS
_____
Patti B. Saris
Chief United States District Judge